IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SUSAN TESTANI, | : |
| | : |
| RONA BROWN | : |
| | : Civil Action |
| and JOY SULLIVAN, | : |
| | : Case No. |
| Plaintiffs, | : |
| | : |
| vs. | : **COMPLAINT** |
| | : |
| KEVIN JAMESON | : |
| | : **JURY TRIAL DEMANDED** |
| and | : |
| | : |
| DEMENTIA SOCIETY INC. D/B/A DEMENTIA SOCIETY OF AMERICA, | : |
| | |
| Defendants. | |

**COMPLAINT**

This dispute centers on Defendant Kevin Jameson, who by and through the not-for-profit corporation he founded and controls, Dementia Society Inc. d/b/a Dementia Society of America ("Dementia Society"), engaged in outrageous and willful violations of the rights of his employees, Plaintiffs Susan Testani, Rona Brown and Joy Sullivan, by secretly wiretapping their offices with hidden listening devices (and possibly hidden video cameras), recording and listening to their personal conversations, and repeatedly invading their privacy in violation of federal and state law.

When confronted with his criminal conduct, Jameson was unapologetic. He admitted that he planted the devices but claimed that such spying was commonplace and that the law was dumb (implying that he could therefore choose not to follow it).

Worse, after the employees reported Jameson's misconduct to the Board of Dementia Society Inc., which Jameson chaired and controlled, the Board failed to independently investigate

1

and instead locked the Plaintiffs out of the office and brought in criminal defense lawyers to defend and protect Jameson from liability. Later, after Plaintiffs reported the criminal wiretapping to the police, Defendants fired all three employees in retaliation.

This Complaint seeks to vindicate the Plaintiffs' rights and hold Defendants accountable for their mistreatment, invasion of the privacy, and unlawful retaliation. Plaintiffs seek to be made whole for their losses, to recover all damages they have suffered, and to impose punitive damages on the Defendants for their willful and outrageous violations of the law.

Plaintiffs therefore complain as follows:

**PARTIES**

1. Plaintiff Susan Testani is an individual residing in Doylestown, Pennsylvania, and is therefore a citizen of Pennsylvania. She worked as Executive Administrator for Dementia Society.

2. Plaintiff Rona Brown is an individual residing in Doylestown, Pennsylvania, and is therefore a citizen of Pennsylvania. She worked as Membership Coordinator for Dementia Society.

3. Plaintiff Joy Sullivan is an individual residing in Hilltown Township, Pennsylvania, and is therefore a citizen of Pennsylvania. She worked as Donations Processor for Dementia Society.

4. Defendant Kevin Jameson is an individual residing in Doylestown, Pennsylvania, and is therefore a citizen of Pennsylvania. He is Founder, Chief Executive Officer, President and Chairman of the Board of defendant Dementia Society Inc. and controls the organization.

5. Defendant Dementia Society Inc. d/b/a Dementia Society of America (hereinafter referenced as "Dementia Society") is a not-for-profit entity incorporated in Pennsylvania and has

its principal place of business in Doylestown, Pennsylvania. It is therefore a citizen of Pennsylvania. Dementia Society generated close to $6 million in revenues in 2023.

## JURISDICTION AND VENUE

6. This Court has personal jurisdiction over the Defendants as both of them are citizens of the Commonwealth of Pennsylvania.

7. Dementia Society has its principal place of business in this District and the unlawful conduct alleged in this Complaint occurred in this District. Therefore, this Court has specific and general personal jurisdiction over Dementia Society.

8. Jameson resides in Pennsylvania and engaged in misconduct in this District relevant to this action. Therefore, this Court has general and specific personal jurisdiction over Jameson.

9. Count I of this action for violation of the Electronic Communications and Privacy Act (the "Federal Wiretap Act"), 18 U.S.C.A. § 2510 et seq., arises under the laws of the United States, and therefore this Court has original subject matter jurisdiction over that claim. 28 U.S.C. § 1331.

10. This Court has supplement jurisdiction over all other claims in this action as they form part of the case or controversy as the claims for which this Court has original jurisdiction, as all arise from the Defendants' unlawful wiretapping and spying on the Plaintiffs, and the Defendants' retaliatory reaction to the Plaintiffs' discovery and objection to such wiretapping. 28 U.S.C. § 1367(a).

11. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because all of the events giving rise to the claims occurred in this District.

## STATEMENT OF FACTS

12. All three Plaintiffs worked as employees of Dementia Society at its headquarters on Main Street in Doylestown, Pa.

13. All three Plaintiffs were dedicated and loyal employees with excellent performance histories at Dementia Society. None had any performance or conduct issues during their employments.

14. On February 19, 2024, Testani discovered an electronic listening/recording device hidden on a shelf in her office at Dementia Society, behind a promotional piece. She had never been informed of the listening device or told that her office was bugged.

15. The device was circular and had an on/off switch. When Testani turned it off, the device projected a voice stating, "microphone off," confirming that it was being used as a listening device that electronically transmitted sound.

16. Upon reporting the device to her co-workers, they began searching their workspaces for other hidden electronic listening/recording devices. They found another hidden on a shelf near a co-worker's desk, hidden behind a stack of informational pamphlets.

17. They also discovered that a device in the office of Sullivan and Brown that Jameson had referred to as "the doorbell" was actually a listening device, unbeknownst to the employees there. It never functioned as a doorbell, contrary to Jameson's claim.

18. None of the Plaintiffs had been informed the office was bugged, and each had an expectation of privacy when speaking about personal and private matters at work in their own workspaces, such as during closed-door private telephone conversations with family and friends and oral conversations with co-workers.

19.     Due to this expectation of privacy, the Plaintiffs often discussed highly private and personal matters at their workspaces, including items related to their health, family issues, conversations with family members and friends, and private concerns about the odd behavior of their supervisor, Jameson.

20.     Plaintiffs' private conversations at their own desks could not be heard by Jameson at his desk or any third parties through normal hearing without using the hidden devices.

21.     Such conversations could, however, be picked up by the secret listening devices Jameson had planted in their work areas.

22.     Upon discovering the secret listening devices, each Plaintiff felt violated, knowing that Jameson had been listening in on their private conversations, spying on them, and invading their privacy.

23.     Jameson also engaged in similar surveillance and privacy invasions at work, including going through the garbage cans of each Plaintiff nightly, snooping on their email communications and web usage, and directing them to only use the downstairs bathroom (not the one on the floor of their offices). Plaintiffs reasonably feared that Jameson might have hidden another listening device or camera in the downstairs bathroom, causing them further anxiety, stress and suffering.

24.     Plaintiffs were never put on notice or consented to email snooping, garbage can sifting, or any monitoring of their use of the bathroom at Dementia Society.

25.     Later on during the morning that Plaintiffs discovered the devices (February 19, 2024) and unplugged the secret listening device in Testani's office, Jameson arrived at the office and went to his desk. Soon after that, he walked into Testani's office and said, "Oh Google, Oh Google!" He then picked up the secret listening device, still in Testani's office, and asked her,

"Why is this off?" This conduct and question confirmed that (1) Jameson was monitoring the device from his office and (2) that he had planted the device in Testani's office and knew its exact location.

26. Testani responded to Jameson with words to the effect of, "I'm not comfortable with you recording me. I never gave you my permission to do that."

27. Jameson did not deny he had been recording and listening in on her but said, "Oh, this is a nothing burger. . . . I've got them at home and here."

28. When Testani protested that it was illegal to record or bug a person's office without their consent, Jameson responded with words to the effect of, "It's a stupid law. Abortion is illegal in some states, too."

29. Plaintiff Joy Sullivan then entered Testani's office and told Jameson words to the effect of, "Kevin, we're telling you that as employees we are not comfortable with these [listening devices] in our offices."

30. Jameson responded that he viewed the office like his home and said words to the effect of, "By the way, the government's listening in on you, too." He referred to the FBI and CIA.

31. Jameson said he was not going to stop using the listening devices just because the employees objected, adding words to the effect of, "You could turn yours off if you want. I've got microphones all over here." He also said words to the effect of, "I am not going to stop using technology."

32. These statements and unapologetic admissions by Jameson rattled the Plaintiffs, who were frightened by Jameson's approach and disregard for their privacy rights.

33. The next day, on February 20, 2024, the employees reported the spying and illegal wiretapping to the Dementia Society Board of Directors. The Plaintiffs' goal was to stop the unlawful bugging and surveillance of their offices and to continue their employment without further incident.

34. Unfortunately, the Board was dominated by Jameson, who chaired the Board and whose wife, Ann Redfield, and other friends served on the Board.

35. In response to the email notice of Jameson's spying, Jameson emailed the Plaintiffs on February 21, 2024, saying, "Don't bother coming in until we speak next." The email's subject line was "DSA Offices Closed Until Further Notice." Jameson effectively locked Plaintiffs out of their jobs for reporting his illegal wiretapping and invasion of their privacy.

36. Importantly, however, and contrary to the "Offices Closed" subject line, Jameson continued to have full access to the office and was seen entering, leaving, and working at his desk on numerous occasions. That access gave him time to destroy evidence of his criminal conduct.

37. On information and belief, the Board of Dementia Society never took any actions to restrict Jameson's activities, preserve the crime scene, discipline him, or correct his unlawful behavior.

38. On February 22, 2024, Plaintiffs reported the incident to the Central Bucks Regional Police Department, including photographs of the secret listening devices and a summary of the illegal wiretapping and Jameson's admission to same.

39. The police investigated of the matter, interviewed persons with knowledge at Dementia Society, apparently confirmed that Plaintiffs had been subjected to unlawful wiretaps,

and referred the matter to the Bucks County District Attorney's Office on or about March 20, 2024.

40. On February 25, 2024, three days after Plaintiffs reported the unlawful conduct to the police, Dementia Society Board Member Blaine Greenfield emailed employees that the Board was now taking the report seriously, the situation would be promptly investigated, and appropriate corrective action would be taken, if warranted.

41. He also stated that employees would be paid during the lockout and investigation.

42. Rather than conducting an independent investigation, however, Dementia Society merely "lawyered up." It brought in its lawyers, a large management/insurance defense law firm based in Philadelphia, Cozen O'Connor, to represent and protect Jameson and the organization and conduct a review under the cloak of attorney-client privilege.

43. On information and belief, Cozen O'Connor kept Jameson (the accused) fully abreast of its review, findings, advice and report on the situation and let him have ultimate authority to decide what actions to take, stripping its so-called "investigation" of any veneer of fairness or independence. Meanwhile, Cozen O'Connor provided no details on the investigation to the Plaintiffs, who were the victims of the crime and left twisting in the wind.

44. Over the next month the Plaintiffs repeatedly inquired to the Board and to Dementia Society's lawyers as to the status of the investigation and the steps taken. They received almost no information in response.

45. On March 1, 2024, Cozen O'Connor attorneys Stephen Miller and Catherine Yun met with Testani over Zoom. At the end of questioning, Miller said one scenario being considered was to remove Jameson from his position. Another was to have Testani and her co-workers let go with severance.

46. On March 15, 2024, Miller wrote to Testani and asserted that, "The investigation was very thorough. We tested the allegation in several, different ways, and there was no evidence to support an assertion that there was a 'wiretapping situation' at the DSA Office."

47. This was obviously false and misleading advocacy on behalf of Defendants, with Miller attempting to convince Testani that the investigation had been fair and "very thorough," and that the employees' claims lacked merit.

48. When Testani asked to see the report on the investigation, Miller refused to provide it, stating that it was attorney-client privileged.

49. On or about March 19, 2024, Dementia Society Board Treasurer Jeff Moyer and a Cozen O'Connor attorney met with each Plaintiff separately to discuss the "path forward." This included the Cozen O'Connor attorney stating that her job was to make a recommendation as to that path, further revealing that Cozen O'Connor was operating as an advisor and operative for Dementia Society, and not as an independent investigator.

50. Plaintiffs raised concerns that Jameson, the wrongdoer, had been allowed to continue coming into the office and working normally, while they were suspended with pay and forced to stay home and do no work. They expressed concerns about the unequal treatment and the apparent lack of repercussions to Jameson for his criminal conduct, as well as Jameson's access to the Cozen O'Connor review and report, while they were blocked from seeing it.

51. On March 21, 2024, Jeff Moyers sent an email to the three Plaintiffs stating that there was no viable path forward and they were being terminated effective that day.

52. Each Plaintiff was fired that day, without any advance notice or severance pay.

53. Defendants ordered the firing of Plaintiffs in retaliation for exercising their right to report Jameson's criminal conduct to the Central Bucks Regional Police Department.

9

54. Defendant Kevin Jameson's actions were within his authority and approval of the Dementia Society, as its CEO and Chairman of its Board.

55. Each Plaintiff has suffered and continues to suffer stress, anxiety, emotional distress, pain and suffering as a result of the Defendants' actions.

56. Each Plaintiff has incurred substantial economic losses, including back pay and front pay, as a result of her respective firing.

57. Each Plaintiff has incurred damage to her reputation and prospects for future employment and career growth as a result of the firing.

## COUNT I

## INVASION OF PRIVACY IN VIOLATION OF

## PENNSYLVANIA WIRETAPPING AND ELECTRONIC SURVEILLANCE AND

## CONTROL ACT ("PENNSYLVANIA WIRETAP ACT")

## ALL PLAINTIFFS v. JAMESON AND DEMENTIA SOCIETY

58. All previous allegations in this Complaint are incorporated in this paragraph.

59. To establish a prima facie case under the Pennsylvania Wiretap Act for interception of an oral communication, a plaintiff must demonstrate: (1) that she engaged in a communication; (2) that she possessed an expectation that the communication would not be intercepted; (3) that her expectation was justifiable under the circumstances; and (4) that the defendant attempted to, or successfully intercepted the communication, or encouraged another to do so.

60. As set forth above, (1) Testani, Brown and Sullivan each engaged in oral communications about private and personal matters from their desks, offices and other locations at Dementia Society; (2) Testani, Brown and Sullivan each expected that the communications would not be intercepted and had no notice or reason to believe that Defendants were intercepting

their communications, eavesdropping, and listening covertly to them; (3) Testani's, Brown's and Sullivan's expectations were each justifiable under the circumstances, as Defendants planted the listening devices ("wiretaps") in their personal offices and around their desks without notice and without it being apparent that the devices were listening devices that transmitted sound; and (4) Defendants Jameson and Dementia Society attempted to and did successfully intercept and listen to Testani's, Brown's and Sullivan's private communications through these secret devices. On information and belief, Defendants also may have surreptitiously recorded Plaintiffs' private communications through the secret listening devices.

61.    Jameson, on behalf of himself and Dementia Society, engaged in this conduct in knowing, willful and outrageous violation of the Pennsylvania Wiretap Act, and with the full support and approval of the Dementia Society, its CEO (himself), and its Board.

62.    When the Board of Dementia Society was made aware of this illegal conduct, it placed the Plaintiffs on administrative leave and forbade them from re-entering the Dementia Society office or conducting work for Dementia Society but allowed Jameson to continue his presence and work in the office, cover up his illegal conduct, and, on information and belief, did not place him on administrative leave or discipline him in any way.

63.    Each Plaintiff suffered losses and damages, as set forth above.

## COUNT II

## INVASION OF PRIVACY IN VIOLATION OF

## FEDERAL ELECTRONIC COMMUNICATIONS AND PRIVACY ACT

## ("FEDERAL WIRETAP ACT")

### ALL PLAINTIFFS v. JAMESON AND DEMENTIA SOCIETY

64.    All previous allegations in this Complaint are incorporated in this paragraph.

65. Each Plaintiff engaged in oral communications about personal and private matters from their offices at Dementia Society in the past two years, as set forth above.

66. Each Plaintiff had a reasonable expectation of privacy in those communications.

67. Each Plaintiff's expectation of privacy was justifiable under the circumstances, as they were never informed they were being bugged, eavesdropped, or listened to electronically as they had personal conversations at their workspaces.

68. Defendants attempted to and successfully did intercept the private communications of each Plaintiff using electronic devices that transmitted sound secretly planted in their workspaces.

69. On information and belief, Defendants also may have surreptitiously recorded Plaintiffs' private communications through the secret listening devices.

70. Defendants acted in knowing, willful and outrageous violation of the law.

71. Each Plaintiff suffered losses and damages, as set forth above.

## COUNT III

## WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY

## ALL PLAINTIFFS v. JAMESON AND DEMENTIA SOCIETY

72. All previous allegations in this Complaint are incorporated in this paragraph.

73. Each Plaintiff suffered losses and damages, as set forth above.

74. Pennsylvania's Crime Victims Act, 44 Pa. Code § 101 et seq., encourages victims of state and federal crimes to report and cooperate with the police with regard to criminal conduct, including any violation of federal criminal law.

75.     At the heart of this statute is the "recognition of the civic and moral duty of victims of crime to fully and voluntarily cooperate with law enforcement and prosecutorial agencies," including the reporting and prosecution of crime. *Id.* at section 102.

76.     Consistent with the law, the Pennsylvania Office of Victim Services advises in its official guidance to citizens of the Commonwealth, "It is important to report a crime because if you do not, the police will not be aware of the crime and will not be able to take any action."

77.     State law also prohibits intimidation, obstruction, or interference of witnesses or victims who report crimes, as it interferes with the administration of criminal justice:

> Offense defined.--A person commits an offense if, with the intent to or with the knowledge that his conduct will obstruct, impede, impair, prevent or interfere with the administration of criminal justice, he intimidates or attempts to intimidate any witness or victim to: (1) Refrain from informing or reporting to any law enforcement officer, prosecuting official or judge concerning any information, document or thing relating to the commission of a crime.

18 Pa. C.S. § 4952.

78.     The Pennsylvania Rules of Criminal Procedure empower citizens who are not law enforcement officers to institute criminal proceedings. Pa. R. Crim. P. 420.

79.     As set forth more fully above, on February 22, 2024, Plaintiffs engaged in conduct protected under the law and public policy of Pennsylvania by reporting Defendants' criminal conduct to the Central Bucks Regional Police Department (the "Police").

80.     In response, Defendants allowed Jameson to cover up and destroy evidence of his wrongdoing. In addition, Defendants hired criminal defense lawyers to defend Dementia Society and Jameson. Defendants and their lawyers then conducted a privileged and pretextual "investigation" of the Defendants' criminal conduct, in an attempt to cover up the criminal conduct and shield Defendants from prosecution and liability.

81. Defendants' lawyers refused to allow Plaintiffs to see the report or findings of the so-called investigation but shared it with Jameson and the Dementia Society Board and, on information and belief, allowed Defendants to decide the direction of the investigation and the fate of Plaintiffs.

82. Four weeks after the Plaintiffs filed their legally protected complaint to the Police, Defendants fired them in retaliation for making their complaint.

83. Defendants gave false and pretextual reasons for these terminations, which never would have happened if Plaintiffs had not reported their unlawful conduct to the police, as was their right under the law.

84. Notably, Plaintiffs had tried unsuccessfully to address this matter internally before going to the Police. They did not violate their chain of command. Plaintiffs first addressed Jameson's criminal conduct with him. When that was not successful, they reported their concerns to the Board of the Dementia Society. Thereafter, the Dementia Society Board did not take actions to restrict Jameson's activities, preserve the crime scene, discipline him, or correct his unlawful behavior, and instead suspended Plaintiffs and hired defense lawyers to protect themselves – not Plaintiffs. Plaintiffs reported the matter to the Police after realizing that the matter would not be fairly investigated or corrected internally by Defendants.

85. Defendants' actions were malicious, outrageous and in knowing and willful violation of the law and of Plaintiffs' rights.

86. Each Plaintiff suffered losses and damages, as set forth above.

**COUNT IV**

**INVASION OF PRIVACY – INTRUSION UPON SECLUSION**

**ALL PLAINTIFFS v. JAMESON AND DEMENTIA SOCIETY**

87. All previous allegations in this Complaint are incorporated in this paragraph.

88. Through the unlawful bugging of Plaintiffs' offices and Jameson's secretive listening to the private conversations of Plaintiffs at work, as set forth more fully above, he intentionally interfered with their seclusion and privacy.

89. This intrusion included listening in on their personal discussions of private affairs, including family and medical issues having nothing to do with the work of the Dementia Society.

90. Plaintiffs had these conversations privately in their offices, often behind closed doors, not expecting Jameson or any third party to be listening and eavesdropping in on them.

91. Defendants' interference with the Plaintiffs' seclusion was substantial and occurred daily for months.

92. Plaintiffs found the bugging of their offices and personal conversations offensive and strongly objected, as would any ordinary and reasonable person.

93. Each Plaintiff suffered losses and damages, as set forth above.

94. Defendants' actions were malicious, outrageous and in knowing and willful violation of the law and of Plaintiffs' rights.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Susan Testani, Rona Brown and Joy Sullivan request the following relief:

95. A judgment declaring that Defendants violated the law under each Count identified above.

96. An order enjoining Defendants from continuing their unlawful and secretive wiretapping and bugging of the Dementia Society offices and workers, volunteers and other persons there.

97. An award of all damages suffered in an amount to be determined and proved at trial, including economic losses, emotional distress and suffering, and loss of enjoyment of life.

98. A judgment that Jameson engaged in conduct that is outrageous, malicious, and in wanton disregard of Plaintiffs' rights, and an award of punitive damages.

99. A judgment awarding Plaintiffs' fees and costs in this action, including without limitation his reasonable attorneys' fees and costs.

100. An award of any negative tax consequences each Plaintiff suffers as a result of the lump sum award of damages for front pay and back pay.

101. An award to Plaintiffs of pre-judgment and post-judgment interest.

102. Such other relief as the Court deems just and appropriate.

Respectfully submitted,

By: _____
Michael D. Homans
ID No. 76624
HOMANSPECK, LLC
230 Sugartown Road
Suite 218
Wayne, PA 19087
(215) 419-7463
mhomans@homanspeck.com

*Attorneys for Plaintiffs Susan Testani, Rona Brown and Joy Sullivan*